## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **SANTOS RODRIGUEZ,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3:15-CV-36-NJR-DGW** |
| | ) | |
| **TIMOTHY VEATH, MIHN SCOTT,** | ) | |
| **JASON HART, REBECCA COWAN,** | ) | |
| **LANCE PHELPS,** | ) | |
| **JOSHUA SCHOENBECK,** | ) | |
| **BRANDON ANTHONY, and** | ) | |
| **KIMBERLY BUTLER,** | ) | |
| | ) | |
| **Defendants.** | ) | |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Currently pending before the Court is the Motion for Summary Judgment filed by Defendants on August 18, 2016 (Doc. 86). Plaintiff Santos Rodriguez filed a response to Defendants' statement of undisputed material facts (Doc. 97), as well as a response in opposition to Defendants' motion for summary judgment (Doc. 98). Defendants did not file a reply. The Court has considered the briefs and all of the evidence submitted by the parties and, for the reasons set forth below, the Motion for Summary Judgment is granted in part and denied in part.

### INTRODUCTION

Plaintiff Santos Rodriguez, an inmate currently incarcerated at Menard Correctional Center, filed an Amended Complaint pursuant to 42 U.S.C. § 1983 alleging

claims related to his placement in segregation for a period of 405 days (Doc. 67). Specifically, Rodriguez alleges that on February 6, 2013, he was issued a disciplinary ticket along with his cellmate for having Security Threat Group material (*i.e.*, gang-related material) in his cell ("STG Ticket"). During the subsequent disciplinary proceedings he was found guilty and sentenced to six months segregation. He was, however, released from segregation after serving 71 days.

On June 2, 2013, after his cell had been searched twice within a week, Rodriguez was issued another disciplinary ticket for having a weapon ("weapons ticket"). He was placed back in segregation; this time he was sentenced to a year. A few weeks into his term of segregation, on August 21, 2013, Rodriguez was transferred to the segregation unit at the Pontiac Correctional Center. While Rodriguez does not allege when he was released from segregation, he was likely released in May 2014. Rodriguez claims that he was released on both occasions early because his grievances were granted by the Administrative Review Board. In light of these events, Rodriguez alleges the following due process, equal protection, conspiracy, and retaliation claims related to the incidents that occurred in 2013:

> **Count 1**:    Equal protection claim against Defendants Lance Phelps, Timothy Veath, Mihn Scott, Rebecca Cowan, and Joshua Schoenbeck related to the February 2013 STG ticket;
>
> **Count 2**:    Conspiracy claim against Defendants Lance Phelps, Timothy Veath, Mihn Scott, Rebecca Cowan, and Joshua Schoenbeck related to the February 2013 STG ticket;
>
> **Count 3**:    Equal protection claim against Defendants Brandon Anthony, Lance Phelps, Jason Hart, Timothy Veath, and Rebecca Cowan related to the June 2013 weapons ticket;

**Count 4**:     Due Process claim against Brandon Anthony, Lance Phelps, Jason Hart, Timothy Veath, and Rebecca Cowan related to the June 2013 weapons ticket;

**Count 5**:     Conspiracy claim against Brandon Anthony, Lance Phelps, Jason Hart, Timothy Veath, and Rebecca Cowan related to the June 2013 weapons ticket; and

**Count 6**:     Retaliation claim against Brandon Anthony, Lance Phelps, Jason Hart, Timothy Veath, and Rebecca Cowan related to the filing of a grievance as to the February 2013 STG ticket and subsequent term in segregation.

(Doc. 67). Rodriguez seeks both damages and injunctive relief.

## BACKGROUND

The following facts are undisputed except where noted. In February 2013, members of the Latin Folks prison gang assaulted correctional officers in the chapel at Menard Correctional Center (Doc. 87-1). Rodriguez was not in the chapel at the time of the attack; he was in the law library (*Id.*). Nevertheless, he was "grabbed" from the library, strip-searched, and then questioned about the attack by Defendants Lance Phelps and Joshua Schoenbeck, members of Internal Affairs (*Id.*). They questioned Rodriguez about his gang affiliation—he identified himself as a Maniac Latin Disciple upon his arrival in the Illinois Department of Corrections in 2008—but Rodriguez stated that he no longer had any gang affiliation (*Id.* at pp. 13, 57–59).[1] They also questioned him about a previous disciplinary ticket that he had received from Correctional Officer Hudson, who was one of the officers assaulted in the chapel (*Id.*). Rodriguez denied any involvement in the assault (*Id.*). Officer Schoenbeck stated, however, that he did not

---

[1] Defendants believed that the Maniac Latin Disciples were "part of the general Latin Folk affiliation group" (Doc. 87-1, p. 13-14).

think it was a coincidence that the attack on Hudson occurred shortly after Rodriguez's return to Menard (*Id.*). Officer Shoenbeck told Rodriguez that "they look after their own," and Rodriguez would not remain in general population (*Id.*). Rodriguez was then sent back to his cell (*Id.*).

That night (February 6, 2013),[2] Rodriguez received a disciplinary ticket for possessing Security Threat Group ("STG") material, including eight photographs of persons "flashing" gang signs (Doc. 87-4). The STG ticket was issued by Officer Daniel Schott who, along with Officer Cliff Bradley, had searched Rodriguez's cell while he was being interviewed about the chapel assault (Doc. 87-1).[3] Rodriguez's cellmate, an African-American named Denarrell Mabry, received the same ticket (Doc. 87-8). Defendant Rebecca **Cowan** was the "Reviewing Officer" and signed off on the STG ticket (Doc. 87-3; *see* Doc. 87-4).

Two days later, Rodriguez appeared for an Adjustment Committee hearing on the STG ticket (*see* Doc. 87-6). The Adjustment Committee was composed of Defendant Timothy **Veath**, who was the Chairperson, and Defendant Mihn **Scott** (*see* Doc. 87-6). Defendant Rebecca Cowan also was present at the hearing (Doc. 87-1). Rodriguez asked to see the purported STG material that was confiscated from his cell, but his request was denied (Doc. 87-1). Rodriguez pleaded not guilty to the infraction (Doc. 87-6). During the brief hearing, Defendant Veath referenced the chapel assault and appeared to inquire whether Rodriguez's "guys," *i.e.* gang, committed the assault (Doc. 87-1). Rodriguez said

---

[2] In their briefs, the parties indicate that the ticket was written on February 8, 2013 (Doc. 87, Doc. 97). The ticket itself, however, indicates that it was written and signed on February 6, 2013 (Doc. 87-4).

[3] Neither Officer Schott nor Officer Bradley are named as defendants in this matter.

he had no knowledge and was sent back to his cell (*Id.*). While in his cell, Rodriguez spoke to Mabry about his hearing (*Id.*). Mabry said that he attempted to plead guilty to possessing the STG material but was told by **Veath** to state that the material belonged to Rodriguez (*Id.*). Shortly thereafter, Rodriguez and Mabry were both found guilty and given six months in segregation (Doc. 87-6; Doc. 87-8).

Rodriguez was in segregation for 71 days (Doc. 87-1). In his cell, there was no cold water, the faucet leaked, the toilet malfunctioned, the mattress was stained and "funky," the steel bunk was rusted, and the paint was peeling (*Id.*). Rodriguez filed grievances about the conditions of his cell (*Id.*). He also filed a grievance dated February 8, 2013, about the disciplinary proceedings, and he included with the grievance an affidavit signed by Mabry in which Mabry claimed ownership of the STG material found in their cell (*Id.*; Doc. 1-1, p. 15). On April 17, 2013, the grievance officer recommended that Rodriguez's disciplinary ticket be expunged and that Rodriguez be released from segregation (Doc. 1-1, p. 17). The warden agreed with the recommendation (*Id.*)

After his release from segregation, Rodriguez was returned to general population (Doc. 87-1). His new cellmate was Doug Tate, an African American (*Id.*). As Rodriguez was walking to his new cell, two different officers commented that they would make sure Rodriguez did not "beat the next ticket," or something to that effect (*Id.*). A week or two later, Rodriguez's cell was searched (Doc. 87-1). Within a week, it was searched again by Officer Holcomb on June 2, 2013 (*Id.*).[4] Following that second search, Rodriguez was told by Officer Holcomb that his cell was free of contraband and he

---

[4] There appears to be some discrepancy or confusion in Rodriguez's deposition about the timing of the searches. Rodriguez's timeline is shorter than the documentary evidence suggests (*see* Docs. 87-1, 87-5).

would get a shakedown slip the next day (*Id.*). While Rodriguez and Tate were cleaning up their cell, Correctional Officer Richard Ransom[5] stood outside their cell grinning before walking down the gallery (*Id.*). Shortly thereafter, he returned to Rodriguez's cell with another correctional officer and told Rodriguez and Tate to pack their belongings (*Id.*). When they asked why, Officer Ransom showed them a knife, which was purportedly found outside their cell in the "door railing rolled up in toilet paper" (*Id.*; Doc. 87-5).

Rodriguez and Tate were taken to talk to Internal Affairs (Doc. 87-1). Rodriguez was interviewed by Defendant Brandon Anthony, where Anthony said to him, "you didn't think we were actually going to let you stay in population" (*Id.*). Anthony also mentioned the STG ticket that Rodriguez got expunged and stated that Rodriguez had "beat the ticket" (*Id.*). Following the interview, Rodriguez was taken to segregation and that night he received a copy of the disciplinary ticket issued to him and Tate for possessing dangerous contraband (hereinafter "weapons ticket") (Doc. 87-5). Once again, Defendant Rebecca Cowan was the "Reviewing Officer" and signed off on the weapons ticket (Doc. 87-3).

Rodriguez filled out the bottom section of the disciplinary ticket requesting that Officer Holcomb be called as a witness at his hearing in front of the Adjustment Committee, and he submitted it for delivery to the Committee (Doc. 87-1). Rodriguez intended for Officer Holcomb to testify to the fact that he was the officer who searched the cell and didn't find anything (*Id.*). Rodriguez appeared for the Adjustment

---

[5] Officer Ransom is not named as a Defendant in this matter.

Committee hearing on the weapons ticket on June 4, 2013 (Doc. 87-7). The Committee was composed of Defendant Timothy Veath, who was the Chairperson, and Defendant Jason Hart (Doc. 87-7). Defendant Rebecca Cowan also was present at the hearing (Doc. 87-1). Rodriguez pleaded not guilty to the infraction, at which point Defendant Veath made the comment: "I know how much you Latinos like playing with shanks" (*Id*.). Rodriguez then referred to the written statement that he brought with him and told Defendant Veath to talk to Officer Holcomb (*Id*.). Rodriguez was found guilty and given one year in segregation (Doc. 87-7, Doc. 87-1, p. 49). The final report does not indicate that Rodriguez requested Officer Holcomb to testify as a witness (*see* Doc. 87-7).

Tate also was found guilty and received one year in segregation (Doc. 87-10). His sentence was reduced by 50 weeks, however, for "participation in an investigation" (Docs. 87-13 and 87-14); he was released from segregation after serving two weeks.

This time around, Rodriguez was not in the same cell that he was in during his first stint in segregation, but this cell was in the same condition (Doc. 87-1). Rodriguez also had to deal with a lack of ventilation and extremely hot temperatures in his cell because it was the summertime—Rodriguez claims that a thermometer in the cellhouse registered the "heat index" at 120 degrees (Doc. 87-1, p. 51). Sometime in August 2013, after a couple of months in segregation at Menard, Rodriguez was transferred to segregation at Pontiac Correctional Center (Doc. 87-1). Rodriguez claims his cell at Pontiac was "disgusting," smelled of urine, had "urine and fecal matter all in the cell," and had wads of toilet paper all over the floor (*Id*.). Rodriguez asked for cleaning supplies but was told they would not be passed out for another four days (*Id*.).

Rodriguez tried to clean his cell with some soap and a small towel that he had (*Id.*). Like his segregation cells at Menard, his cell at Pontiac also had a steel door (*Id.*). And it was in a cellhouse with mentally ill inmates who screamed, banged and kicked doors, and threw feces (*Id.*).

Rodriguez filed a grievance dated June 28, 2013, about the weapons ticket and the related disciplinary proceedings (Doc. 1-2, p. 2). His grievance was denied by the warden (Doc. 1-2, pp. 4–5), and he appealed the denial to the ARB. On April 9, 2014, the ARB recommended that Rodriguez's weapons ticket be expunged "due to the charges not being substantiated in the report" (Doc. 1-2, p. 6). Rodriguez was released from segregation roughly two weeks after the ARB issued its decision (Doc. 87-1). By that time, Rodriguez had spent approximately 334 days in segregation (*Id.*). Rodriguez was eventually transferred back to Menard a couple of months after his release from segregation at Pontiac (*Id.*).

## LEGAL STANDARD

The standard applied to summary judgment motions under Federal Rule of Civil Procedure 56 is well-settled and has been succinctly stated as follows:

> Summary judgment is appropriate where the admissible evidence shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. A "material fact" is one identified by the substantive law as affecting the outcome of the suit. A "genuine issue" exists with respect to any such material fact . . . when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." On the other hand, where the factual record taken as a whole could *not* lead a rational trier of fact to find for the non-moving party, there is nothing for a jury to do. In determining whether a genuine issue of material fact exists, we view the record in the light most favorable to the nonmoving party.

*Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 681 (7th Cir. 2014) (citations omitted).

DISCUSSION

**Count 1:      Equal protection claim against Defendants Phelps, Veath, Scott, Cowan, and Schoenbeck related to the STG ticket**

"The Equal Protection Clause guards against government discrimination on the basis of race and other immutable characteristics, but it also extends to protect people from so-called 'class-of-one' discrimination in which a government arbitrarily and irrationally singles out one person for poor treatment." *Brunson v. Murray*, 843 F.3d 698, 705 (7th Cir. 2016) (citing *Geinosky v. City of Chicago*, 675 F.3d 743, 747 (7th Cir. 2012)). Here, Rodriguez claims that he was targeted, issued the STG ticket, and punished with segregation because of his Latino ethnicity (Docs. 67, 98). Thus, his claim is predicated on his membership in a protected class, and he has not asserted a "class of one" claim.

To avoid summary judgment on his equal protection claim, Rodriguez needed to provide evidence that prison officials purposefully treated him differently than other similarly situated inmates who were not Latino. *Xiong v. Wagner*, 700 F.3d 282, 295 (7th Cir. 2012); *Brown v. Budz*, 398 F.3d 904, 916 (7th Cir. 2005); *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000). Unfortunately, however, Rodriguez has presented no evidence of a similarly situated person of a different race or ethnicity who was treated differently by any of the named Defendants. At most, the evidence reveals that Rodriguez's cellmate, Denarrell Mabry, who is African American, was treated in exactly the same manner as Rodriguez with regard to the STG ticket and subsequent discipline. Additionally, Rodriguez has presented no other inmate who was subject to the same

circumstances as Rodriguez: there is no comparable person who was treated any differently as to the general events surrounding the staff assault, subsequent investigation, and any other event leading up to the STG ticket. Merely noting that Rodriguez, a Latino, was questioned because of a staff assault and that a comment was made about a gang that Rodriguez was formerly affiliated with, does not make out an equal protection claim. This claim fails as a matter of law, and Defendants are entitled to summary judgment.

**Count 2:**   **Conspiracy claim against Defendants Phelps, Veath, Scott, Cowan, and Schoenbeck related to the STG ticket**

In Count 2, Rodriguez alleges that Defendants Phelps, Veath, Scott, Cowan, and Schoenbeck engaged in a civil conspiracy to deprive Rodriguez of his equal protection rights with regard to the STG ticket and subsequent punishment (Doc. 67).[6]

While civil conspiracy claims are cognizable under § 1983, *see Lewis v. Washington*, 300 F.3d 829, 831 (7th Cir. 2002), conspiracy is not an independent basis of liability in § 1983 actions. *See Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008) (citing *Cefalu v. Village of Elk Grove*, 211 F.3d 416, 423 (7th Cir. 2000)). "For liability under § 1983 to attach to a conspiracy claim, defendants must conspire to deny plaintiffs their constitutional rights." *Hill v. Shobe*, 93 F.3d 418, 422 (7th Cir. 1996). Thus, in order to succeed on his conspiracy claim, Rodriguez must demonstrate: (1) that Defendants Phelps, Veath, Scott, Cowan, and Schoenbeck had an express or implied agreement to deprive him of his constitutional rights, and (2) that he was actually deprived of his constitutional rights by

---

[6] Notably, Rodriguez does not allege or argue that this purported conspiracy was aimed at depriving him of any constitutional right other than his equal protection rights (*see* Docs. 67, 98).

Defendants' overt actions in furtherance of the agreement. *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015) (citing *Scherer v. Balkema*, 840 F.2d 437, 441-42 (7th Cir. 1998)).

Rodriguez has presented evidence that some of these Defendants, specifically Phelps and Shoenbeck (who investigated the staff assault) and Veath and Scott (who adjudicated the STG ticket), made comments to suggest that they believed that Rodriguez was involved in the staff assault. But even if this was sufficient to show an express or implied agreement, there is no evidence that any of Rodriguez's constitutional rights were violated by either the issuance of the STG ticket or the subsequent disciplinary proceedings. As indicated above, Rodriguez cannot prevail on an equal protection claim related to the STG ticket. Without a constitutional violation, Rodriguez's conspiracy claim related to the STG ticket fails as a matter of law. Defendants are entitled to summary judgment on this claim.

**Count 3:**      **Equal protection claim against Defendants Anthony, Phelps, Hart, Veath, and Cowan related to the weapons ticket**

In Count 3, Rodriguez alleges that he was targeted, issued the weapons ticket, and punished with one year of segregation because of his Latino ethnicity (Doc. 67). As previously indicated, to avoid summary judgment on this claim, Rodriguez needed to provide evidence that prison officials purposefully treated him differently than other similarly situated inmates who were not Latino. *Xiong v. Wagner*, 700 F.3d 282, 295 (7th Cir. 2012); *Brown v. Budz*, 398 F.3d 904, 916 (7th Cir. 2005); *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000).

To support this claim, Rodriguez relies on the comment made by Veath at the hearing that, "I know how much you Latinos like playing with shanks," and on the fact that his African American cellmate, Doug Tate, had his sentence reduced to only two weeks in segregation (Doc. 98). The document recommending that Tate be released from segregation early is signed by "Adjustment Committee Chairman" who, from the other evidence, appears to be none other than Defendant Veath. Thus, the person who imposed the punishment on Tate and Rodriguez later sought to have it expunged as to Tate only; and this is the same person who made a statement about "Latinos" during the Adjustment Committee hearing.

But Veath's comment about Latinos is not an overtly racist or derogatory statement, nor does it appear to be related to any stereotypes of Latinos of which the Court is aware. *See DeWalt*, 224 F.3d at 612 ("The use of racially derogatory language, while unprofessional and deplorable, does not violate the Constitution."). Even if a jury were to find that Veath's statement was racially charged, there is no other evidence from which a jury could conclude that Veath intentionally treated Rodriguez differently than Tate because of Rodriguez's ethnicity. Rodriguez admits that he and Tate were treated in exactly the same manner up to the point of serving their punishment in segregation (*see* Doc. 98, p. 10 ("Plaintiff's cell mate, inmate Tate, who happens to be an African American, also received the same ticket as Plaintiff and the same year in segregation.")) But then Tate's time in segregation was reduced to only two weeks because of his participation in an investigation. Rodriguez seems to suggest that Tate's sentence reduction was a ruse—that Tate did nothing more than deny the knife was his and

implicate Rodriguez (*see* Doc. 98, p. 10). There is no evidence in the record, however, which indicates that the investigation Tate participated in was related to the weapons ticket. Nor is there any evidence that the assistance Tate rendered was insufficient to warrant a reduction in his sentence. The fact remains that Tate cooperated in an investigation and Rodriguez did not, which renders them dissimilar in a material way. *See Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 802 (7th Cir. 2014) (in the employment context stating that: "To be similarly situated, co-workers must be directly comparable to the plaintiff in all material aspects, but they need not be identical in every conceivable way" (quotation marks and citations omitted)).

While Veath was involved in both the statement and Tate's sentence reduction, Rodriguez's attempt to connect them with racial animus is speculative and based on conjecture. No reasonable jury could find for Rodriguez on this equal protection claim, and Defendants are entitled to summary judgment.[7]

### Count 4:     Due Process claim against Defendants Anthony, Phelps, Hart, Veath, and Cowan related to the weapons ticket

In Count 4, Rodriguez claims that **Defendants Anthony, Phelps, Hart, Veath, and Cowan** illegally used the IDOC's disciplinary directives to deny him constitutional safeguards and wrongfully place him in segregation for the weapons ticket (Doc. 67).[8]

---

[7] To the extent that Rodriguez claims that the denial of a witness at the disciplinary hearing violated his equal protection rights (*see* Doc. 98), Rodriguez has not come forth with any evidence that any other similarly situated person was treated differently from him. And, there is no evidence that anyone, other than Veath and Hart, were decision-makers as to the weapons ticket.

[8] Rodriguez's brief in opposition to summary judgment seems to suggest that his due process claim pertains to both the STG ticket and the weapons ticket (*see* Doc. 98, pp. 11–13). However, the due process claim pleaded in the amended complaint pertains *only* to the weapons ticket (*see* Doc. 67). That conclusion is supported by the fact that the due process claim mentions the 334 days Rodriguez served in segregation

Namely, Rodriguez states that he requested a witness, Officer Holcomb, but the witness was not called at the hearing. Rodriguez also claims that his written statement was not considered by the Adjustment Committee.

"A prisoner challenging the process he was afforded in a prison disciplinary proceeding must meet two requirements: (1) he has a liberty or property interest that the state has interfered with; and (2) the procedures he was afforded upon that deprivation were constitutionally deficient. *Scruggs v. Jordan*, 485 F.3d 934, 939 (7th Cir. 2007) (citing *Rowe v. DeBruyn*, 17 F.3d 1047, 1053 (7th Cir. 1994)).

With regard to the first requirement, "an inmate's liberty interest in avoiding segregation is limited." *Hardaway v. Meyerhoff*, 734 F.3d 740, 743 (7th Cir. 2013) (citing *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 697 (7th Cir. 2009)). A protected liberty interest arises only when the plaintiff's confinement in segregation "impose[s] an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Hardaway*, 734 F.3d at 743 (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). In order to determine if a plaintiff endured such a hardship, the court must look to "the combined import of the duration of the segregative confinement *and* the conditions endured." *Hardaway*, 734 F.3d at 743 (quoting *Marion*, 559 F.3d at 697–98).

Here, Rodriguez was in segregation for the weapons ticket for 334 days. A term of segregation this lengthy warrants inquiry into the conditions of that confinement.

---

for the weapons ticket, but it does not mention the 71 days he served in segregation for the STG ticket (Doc. 67, ¶¶103–107). Additionally, the defendants listed in the due process claim—Anthony, Hart, Phelps, Veath, and Cowan—are the same defendants listed in the other claims that relate to the weapons ticket (Counts 3, 5, 6), but different from the defendants listed in the claims that relate to the STG ticket (Counts 1, 2). Consequently, the Court will analyze the due process claim with respect to the weapons ticket only.

*See Marion*, 559 F.3d at 698-99 (holding that a term of 240 days in segregation was lengthy enough to require scrutiny into the actual conditions of segregation).[9]

Rodriguez put forth evidence that he spent somewhere between two and three months of his term in segregation at Menard. His cell had a solid metal door, which led to poor ventilation in his cell. Because it was summertime, the temperatures in his cell were extremely high and could exceed 100 degrees. His cell also had a rusty bed frame, a stained and "funky" mattress, chipping paint, and malfunctioning plumbing. The remainder of Rodriguez's term in segregation was spent at Pontiac. His cell there also had a solid metal door. When he first arrived, the cell smelled of urine, had "urine and fecal matter all in the cell," and had wads of toilet paper all over the floor. He was denied cleaning supplies for four days. His cell also was surrounded by unruly and disruptive mentally ill inmates. While Rodriguez did not get sick from the conditions at Pontiac, he did develop "little rashes" that were treated with ointment (Doc. 87-1).

Also, during Rodriguez's time in segregation at both Menard and Pontiac, his commissary access was reduced, and he was only allowed to spend $15 per month. He was not allowed any contact visits, and he was denied phone privileges. He did,

---

[9] In *Marion*, the Seventh Circuit noted that other circuits have held that "periods of confinement that approach or exceed one year may trigger a cognizable liberty interest without any reference to conditions." *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 699 n.4 (7th Cir. 2009). *See Iqbal v. Hasty*, 490 F.3d 143, 161 (2d Cir. 2007), *cert. granted sub nom. Ashcroft v. Iqbal*, 554 U.S. 902 (2008) (explaining that a segregated confinement of 305 days or more necessarily triggers due process protections, and segregation lasting 101 to 305 days may trigger due process protections, depending on the conditions of segregation); *Trujillo v. Williams*, 465 F.3d 1210, 1225 (10th Cir. 2006) (reversing dismissal of claim involving 750 days' segregation, stating that when a "prisoner is subjected to a lengthy period of segregation, the duration of that confinement may itself be atypical and significant"); *Williams v. Fountain*, 77 F.3d 372, 374 (11th Cir. 1996) (holding that one year of solitary confinement was sufficient to state a claim); *but see Smith v. Mensinger*, 293 F.3d 641, 654 (3d Cir. 2002) (holding that seven months' segregation, alone, does not implicate a liberty interest).

however, get his "regular time" on the yard and in the library. And he was allowed to shower once a week.

In order to determine whether the conditions that Rodriguez faced in disciplinary segregation at Menard and Pontiac imposed "an atypical and significant hardship . . . in relation to the ordinary incidents of prison life," the Supreme Court long ago suggested that those conditions should be compared to both the conditions that prisoners face in discretionary segregation and the conditions that prisoners face in general population. *Lekas v. Briley*, 405 F.3d 602, 608 (7th Cir. 2005) (citing *Sandin v. Conner*, 515 U.S. 472 (1995)).[10] The Seventh Circuit has noted that "under *Sandin*[,] the key comparison is between disciplinary segregation and nondisciplinary segregation rather than between disciplinary segregation and the general prison population." *Lekas*, 405 F.3d at 609 (quoting *Wagner v. Hanks*, 128 F.3d 1173, 1175 (7th Cir. 1997)). That is because "in every state's prison system, any member of the general prison population is subject, without remedy, to assignment to administrative segregation or protective custody at the sole discretion of prison officials . . . if for no other reason than to alleviate over-crowding concerns within the prison," *Lekas*, 405 F.3d at 609 (internal citations omitted), and therefore discretionary segregation is essentially an "ordinary incident of prison life." *See id.* ("Because any member of the general prison population may at any time find

---

[10] Discretionary segregation is "segregation imposed for administrative, protective, or investigative purposes." *Townsend v. Fuchs*, 522 F.3d 765, 771 (7th Cir. 2008). *See also Lekas*, 405 F.3d at 608 n.4 ("[D]iscretionary segregation. . . refers to single-person cells in which persons are sometimes confined not because they have misbehaved but simply because the prison has no other space, wishes to protect some prisoners from others, wishes to keep prisoners isolated from one another in order to minimize the risks of riots or other disturbances, wishes to prevent the spread of disease, and so forth. . . . Such nondisciplinary segregation is also employed for prisoners who are an escape risk, incorrigible, gang leaders, or awaiting transfer or classification.") (internal quotation marks and citations omitted).

himself in segregation for a nondisciplinary reason . . . when a court compares disciplinary segregation to the general prison population, it is effectively comparing disciplinary segregation to discretionary segregation.")

Here, Rodriguez has not presented any evidence or argument that the cells used for disciplinary segregation and discretionary segregation were different (*see* Doc. 98). Rodriguez also has not presented any evidence or argument regarding what a typical cell in general population at Menard or Pontiac looked like or how it compared to his segregation cell (*see* Doc. 98).

Furthermore, the Court has no reason to believe that a rusty bed frame, a stained mattress, and chipped paint exceed conditions that an inmate can expect from confinement generally. *See Delaney v. DeTella,* 256 F.3d 679, 683 (7th Cir. 2001) ("the Constitution does not require that prisons be comfortable"); *Isby v. Clark*, 100 F.3d 502, 505 (7th Cir. 1996) ("Prisons, of course, are not Hilton hotels. And disciplinary segregation units within prisons are not like rooms at a Motel 6."); *Harris v. Fleming,* 839 F.2d 1232, 1235 (7th Cir. 1988) ("Inmates cannot expect the amenities, conveniences and services of a good hotel."). The same goes for the leaky plumbing because there is no evidence that the fixtures were rendered unusable, caused flooding, damaged Rodriguez's belongings, made the water unfit to drink, etc. *See, e.g., Smith v. Melvin*, 94 F.3d 647 (7th Cir. 1996) ("Leaky toilets and puddles are unpleasant but not unconstitutional.").

As for the heat at Menard, Rodriguez's own testimony establishes that prisoners throughout the cellhouse, in segregation and general population alike, suffered

(Doc. 87-1, pp. 27, 51).[11] Rodriguez also did not present any further details about the heat, such as the number of days the temperatures in his cell were hot (*e.g.,* exceeded 85, 90, or 100 degrees), or whether he was given anything to beat the heat like a fan, ice, or extra water. Similarly, Rodriguez indicated the noise and disruption from the mentally ill inmates at Pontiac affected the entire cellhouse (Doc. 87-1, p. 53). He also did not provide specific facts or concrete details about the purported noise and disruption sufficient for a reasonable factfinder to conclude that it went beyond what can normally be expected from confinement generally (*see* Doc. 87-1). And while Rodriguez's cell at Pontiac was filthy when he arrived, he was not immediately given the cleaning supplies that he would have liked; fortunately, he still had running water, soap, and a towel and was able to make due. *Cf. Vinning-El v. Long,* 482 F.3d 923, 924 (7th Cir. 2007) (reversing summary judgment on conditions of confinement claim where the floor of the cell was covered with water, the sink and toilet did not work, and the walls were smeared with blood and feces, and the inmate did not have sheets, toilet paper, towels, shoes, soap, toothpaste, or any personal property for six days.); *Johnson v. Pelker,* 891 F.2d 136, 139 (7th Cir. 1989) (reversing summary judgment on conditions of confinement claim where inmate was housed in cell smeared with feces and with no running water for three days while his requests for cleaning supplies were ignored).

At most, it can be gleaned that prisoners in general population had cells with bars instead of a steel door and were permitted to spend more money at the commissary, use

---

[11] The undersigned also knows that this issue affects all of the prisoners at Menard, not just those in disciplinary segregation, based on the many other lawsuits that have come through this district alleging stifling summertime temperatures at Menard.

the phone, have contact visits, and perhaps take more frequent showers. These conditions, however, do not impose an atypical and significant hardship. *See Hardaway v. Meyerhoff*, 734 F.3d 740, 744 (7th Cir. 2013); *See generally Hoskins v. Lenear*, 395 F.3d 372, 375 (7th Cir. 2005); *Thomas v. Ramos*, 130 F.3d 754, 760 (7th Cir. 1997). That is particularly true in light of the fact that segregation had only a minor adverse impact on Rodriguez's physical health (i.e. the skin rash), and he did not present any evidence that segregation had an adverse effect on his mental stability. *Cf. Gillis v. Litscher*, 468 F.3d 488, 491 (7th Cir. 2006) (prisoner's placement in special unit led him to hear voices, suffer panic attacks, inflict wounds on his body, and become suicidal).

Because no reasonable factfinder could find that Rodriguez's stint in segregation implicated a constitutionally protected liberty interest, the Court need not consider whether the procedures followed during his Adjustment Committee hearing were deficient. Defendants are entitled to summary judgment on this claim.

**Counts 5 and 6:** **Conspiracy claim against Anthony, Phelps, Hart, Veath, and Cowan related to weapons ticket and corresponding retaliation claim**

In Count 5 and 6, Rodriguez alleges that, in retaliation for him for filing the grievance that expunged the STG ticket, the above Defendants conspired to have him punished with close to a year in segregation for a false weapons ticket.

It is well settled that a prison official violates the Constitution when they take action against a prisoner in order to punish the prisoner for engaging in a constitutionally protected activity. *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000). At the summary judgment stage, a prisoner has the initial burden to make out a *prima facie*

case of retaliation by showing that: "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation likely to deter such activity; and (3) the First Amendment activity was at least a motivating factor in the decision to impose the deprivation." *Hawkins v. Mitchell*, 756 F.3d 983, 996 (7th Cir. 2014) (citing *Thayer v. Chiczewski*, 705 F.3d 237, 251 (7th Cir. 2012)). If the prisoner meets his burden, the burden shifts to the defendants to show that the harm would have occurred anyway. *Greene v. Doruff*, 660 F.3d 975, 979 (7th Cir. 2011).

As for the conspiracy claim, "[b]ecause conspiracies are often carried out clandestinely and direct evidence is rarely available, plaintiffs can use circumstantial evidence to establish a conspiracy, but such evidence cannot be speculative." *Beaman v. Freesmeyer*, 776 F.3d 500, 511 (7th Cir. 2015) (citing *Williams v. Seriff*, 342 F.3d 774, 785 (7th Cir. 2003). Moreover, the Seventh Circuit has directed that although "a conspiracy claim cannot survive summary judgment if the allegations are vague, conclusory, and include no overt acts reasonably related to the promotion of the alleged conspiracy," *Amudsen v. Chicago Park Dist.*, 218 F.3d 712, 718 (7th Cir. 2000) (internal quotation marks omitted), "[s]ummary judgment should not be granted if there is evidence from which a reasonable jury could infer the existence of a conspiracy," *Beaman*, 776 F.3d at 510-11.

Here, Rodriguez has met his burden with respect to both claims. He indisputably engaged in an activity protected by the First Amendment when he filed a grievance protesting the STG ticket and the six-month segregation term that Defendant Veath imposed. *DeWalt*, 224 F.3d at 618; *Watkins v. Kasper*, 599 F.3d 791, 798 (7th Cir. 2010). Rodriguez also set forth sufficient evidence to show he suffered a deprivation likely to

deter further grievance-filing when, within weeks of prevailing on his grievance and being released from segregation, he received an even harsher punishment on an arguably bogus weapons ticket. Finally, Rodriguez has set forth a chronology of events showing that his grievance was a motivating factor for the issuance of the weapons ticket, and the investigation and disciplinary hearing that followed.

Specifically, Rodriguez provided evidence showing that very shortly after the STG ticket was expunged and he was released from segregation, two officers separately made comments to him that he "beat the ticket." Within weeks of his return to general population, Rodriguez's cell was searched more than once. And even though Officer Holcomb (the officer who conducted the second search of Rodriguez's cell) told Rodriguez that the cell was contraband-free, Officer Ransom (who had nothing to do with the search of Rodriguez's cell) then announced that he had found a shank outside of Rodriguez's cell in the door. A jury could find that Officer Ransom did not find the shank in the frame of Rodriguez's cell door, but rather found it somewhere on the gallery, and therefore the charges against Rodriguez were false, or at the very least, as indicated by the ARB, "not substantiated."

Rodriguez was interviewed about the incident by Officer Anthony, who told him "you didn't think we were actually going to let you stay in population." This statement could be viewed by a jury as an acknowledgement by Anthony that the whole incident was a set-up. Following the interview, Rodriguez was issued the weapons ticket. At the Adjustment Committee hearing on the weapons ticket, Defendants Veath and Hart imposed an even harsher punishment than the one Rodriguez previously "beat" by

giving him one year in segregation. Veath and Hart also ignored Rodriguez's request to have Officer Holcomb called as a witness. Rodriguez believes they also ignored his written statement. Furthermore, Defendant Veath made a comment at the hearing about Latinos liking shanks. And, Rodriguez's cellmate, Doug Tate, who faced the same charges and received the same punishment as Rodriguez, had his time in segregation reduced to two weeks. Rodriguez's sentence was ultimately expunged by the ARB "due to charges not being substantiated in the report" but not until he spent 334 days in segregation.

Defendant Cowan was the "Reviewing Officer," and signed off on the weapons ticket. She also was present at the hearing on the ticket. Cowan avers that the "Reviewing Officer" is a person who ensures that procedural requirements of the disciplinary report are met (Doc. 87-3, pp. 1-2). She further avers that Defendants Veath and Scott were the members of the Committee, and the only "employees [who] would have authority to suggest or administer discipline" (*Id.*). A reasonable jury could find, however, that Cowan shirked her duties by simply rubberstamping the disciplinary tickets and not ensuring that all of the relevant evidence was considered by the Adjustment Committee.

Defendants counter in a very conclusory fashion that Rodriguez would have received the weapons ticket anyway (Doc. 87). Unfortunately, however, Defendants cite to no facts (*e.g.*, an affidavit) or any case law that plausibly support this outcome (*see* Doc. 87). Also, as noted above, Rodriguez has presented some evidence from which a jury could conclude that the weapons ticket and subsequent hearing were bogus. A

jury could also find that Defendants Veath and Hart blinded themselves to the falsity of the ticket by failing to call Officer Holcomb and failing to read Rodriguez's written report.[12]

The Court finds that when the evidence is viewed as a whole and in the light most favorable to Rodriguez, a reasonable jury could find for Rodriguez. The timeline of events leading from the staff assault in February 2013 to the issuance of the arguably false weapons ticket and sham hearing, and various comments in between, could lead a reasonable jury to believe Defendants Anthony, Veath, Hart, and Cowan were attempting to retaliate against Rodriguez, both individually and as part of a conspiracy, for filing a grievance and getting himself released from segregation.

As for Defendant Phelps, the evidence shows that he authored a "Report of Investigation" regarding the weapons ticket (Docs. 87-11; 87-12). The report was finished on June 22, 2013, about two and a half weeks after the Adjustment Committee hearing on the ticket (Doc. 87-11). Based on the report, it does not appear that Phelps had any direct role in the investigation of the weapons incident. Specifically, the report indicates that Officer Ransom wrote the weapons ticket, Officers Anthony and Jeanette Hecht interviewed Rodriguez about the incident, and Officers Veath and Hart conducted the hearing on the weapons ticket (Doc. 87-12). Rather, it appears that Phelps was simply responsible for compiling all of the documents related to the investigation and writing a

---

[12] Defendants Veath and Hart claim that they did not receive Rodriguez's written request for a witness (Doc. 87), however, it is undisputed that Rodriguez told them at the hearing to speak with Holcomb. It is also unclear whether Veath and Hart reviewed his written report. While these two items would not support a procedural due process claim (as set forth above), they may be circumstantial evidence to support a retaliation claim.

brief summary. In other words, there is no evidence that Phelps was directly involved in any of the events that occurred after the STG ticket was expunged that led Rodriguez to serving 334 days in segregation. Consequently, no reasonable jury could conclude that Defendant Phelps directly retaliated against Rodriguez or conspired to retaliate against him. Accordingly, Defendant Phelps is entitled to summary judgment on Count 5 and Count 6. Defendants Anthony, Hart, Veath, and Cowan are not.

**Qualified Immunity**

Based on the conclusion that Defendants Anthony, Hart, Veath, and Cowan are not entitled to summary judgment on Counts 5 and 6, the Court must consider the issue of qualified immunity (Doc. 87).

"Generally, qualified immunity protects government agents from liability when their actions do not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hernandez v. Cook Cty. Sheriff's Office*, 634 F.3d 906, 914 (7th Cir. 2011) (citing *Purvis v. Oest*, 614 F.3d 713, 720 (7th Cir. 2010)). "It protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015) (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)). In determining whether Defendants are entitled to qualified immunity, the Court must ask two questions: (1) whether the facts, taken in the light most favorable to Rodriguez, show that Defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation. *Hernandez*, 634 F.3d at 914 (citing *Saucier v. Katz*, 533 U.S. 194, 201, 202 (2001)).

Turning first to Defendants Veath and Hart, they assert that they are "entitled to

qualified immunity on all claims" (Doc. 87, p. 19). They do not make any argument or provide any explanation, however, as to how and why the defense is applicable to Counts 5 and 6 (*see id.*). Accordingly, the Court declines to address whether Defendants Veath and Hart are protected by qualified immunity. *Raghunathan v. Holder*, 604 F.3d 371, 378 (7th Cir. 2010) ("[S]tating blankly what one's argument *is* and actually *arguing* a position are different things."); *United States v. Holm,* 326 F.3d 872, 877 (7th Cir. 2003) ("[I]t is not the obligation of this court to research and construct the legal arguments open to parties.").

As for Defendants Anthony and Cowan, they also argue that they are "entitled to qualified immunity on all claims" because they did not impose the punishment on Rodriguez for the two disciplinary tickets in this case (Doc. 87, p. 18). Thus, they claim "they could not have known that they would be held liable for actions they could not take" (*Id.*). The Court is not persuaded by this argument. Defendants Anthony and Cowan neglected to discuss qualified immunity in the context of the actions that they *did* take. The Court already has found that Rodriguez set forth enough evidence for a jury to find that they violated his constitutional rights. And, as further set forth above, it has long been held that jail personnel cannot retaliate against a prisoner, either individually or as part of a conspiracy, for activities protected by the First Amendment. Accordingly, Defendants Anthony and Cowan are not entitled to qualified immunity.

## CONCLUSION

For the reasons set forth above, the Motion for Summary Judgment filed by Defendants on August 18, 2016 (Doc. 86) is **GRANTED in part and DENIED in part**.

The Motion is **GRANTED** as to Counts 1, 2, 3, and 4 for all Defendants listed in those Counts, and as to Counts 5 and 6 for Defendant Lance Phelps only. The Motion is **DENIED** as to Count 5 and 6 for Defendants Brandon Anthony, Jason Hart, Timothy Veath, and Rebecca Cowan. Defendants Mihn Scott, Lance Phelps, and Joshua Schoenbeck are **DISMISSED with prejudice**.

This matter shall proceed on two claims:

**Count 5**:   Conspiracy claim against Anthony, Hart, Veath, and Cowan related to the weapons ticket; and,

**Count 6**:   Retaliation claim against Anthony, Hart, Veath, and Cowan related to the filing of a grievance as to the STG ticket and subsequent term in segregation.

Defendant Butler remains in this action to perfect any injunctive relief that may be ordered.

**IT IS SO ORDERED.**

**DATED:   March 31, 2017**

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**